24-7560-JCB

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINTS

I, Task Force Officer Michael B. Traister, being sworn, state as follows:

## INTRODUCTION

1. I have been a Massachusetts State Police Trooper since April 2016. I am currently assigned to the Division of Investigative Services, Special Investigations Unit of the Massachusetts State Police and to the Federal Bureau of Investigation (FBI) Violent Crimes Task Force in Boston, Massachusetts.  I am a graduate of the 2nd Law Enforcement Certificate Program at the Boylston Police Academy, and I hold a Bachelor's Degree in Criminal Justice from Northeastern University's College of Criminal Justice in Boston, Massachusetts.  I am a graduate of the 82nd Recruit Training Troop of the Massachusetts State Police Academy and I have received training from the Massachusetts State Police which includes, but is not limited to: armed and unarmed robbery, breaking and entering, and larceny investigations.

2. As an FBI Task Force Officer, I have directed, conducted, and participated in many investigations of criminal violations of various federal laws, including investigations of extortion, kidnapping, weapons violations, and armed/unarmed bank robberies. In the course of those investigations, I have executed search and arrest warrants, utilized informants, interviewed witnesses, and conducted surveillance. Additionally, I am authorized to investigate violations of the laws of the United States and I am a law enforcement officer with the authority to execute federal search and arrest warrants.

## PURPOSE OF AFFIDAVIT

3. I submit this affidavit in support of a criminal complaint charging JENEL Flounoury (DOB: xx/xx/1995) (JENEL) and JUSTIN Flounoury (DOB: xx/xx/1991) (JUSTIN) with larceny from a credit union, in violation of 18 U.S.C. § 2113(b); and conspiracy, in violation

of 18 U.S.C. § 371 (the "SUBJECT OFFENSES"). The facts stated herein are based on my own personal involvement with this investigation as well as from information provided to me by other law enforcement officers. Because this affidavit is submitted for the limited purpose of securing a criminal complaint, I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the foundation for the requested complaints.

## PROBABLE CAUSE TO BELIEVE A CRIME WAS COMMITTED

4. On Tuesday, September 24, 2024 at approximately 12:55 PM, the Boston Police Department (BPD) received a radio call reporting a robbery in progress at the Energy Credit Union located at 156 Spring Street, Boston Massachusetts. Members of the BPD arrived on scene and encountered the Credit Union's Chief Financial Officer (CFO),[1] who witnessed the unidentified subject fleeing the bank on Spring Street, onto Constance Street, and then onto Hartlawn Road where he lost sight of the suspect. The suspect was described as a black male, approximately 5'8" – 5'10", medium build, wearing a dark, long-sleeve sweater or jacket, dark pants, dark shoes with white soles, blue baseball hat, blue surgical mask, dark sunglasses, blue latex gloves, and, notably, using a silver crutch. The CFO provided law enforcement with video surveillance and images of the robbery.

5. Investigators assigned to the FBI Violent Crimes Task Force arrived on scene and interviewed the person identified as the victim teller, JENEL. JENEL provided the following information: at approximately 12:51 PM JENEL was working at his teller station and was approached by an unidentified male who demanded US currency. JENEL stated that the suspect

---

[1] The identities of the individuals identified herein by position or as witnesses are known to law enforcement.

began writing a demand note which read, "Hand it over." JENEL read the note and immediately turned around and entered a closed door leading to the main vault of the bank. JENEL opened the top right vault, which is contained within the main vault, and proceeded to retrieve all the US currency contained in that vault. JENEL stated he placed the money in a blue ATM bag. JENEL exited the vault and handed the suspect the ATM bag containing approximately $197,146.00 US currency. JENEL stated the suspect collected the bag and stated, "Thank you, sir." The suspect then fled the bank in an unknown direction. JENEL did not mention a threat of a weapon during the robbery.

6. JENEL described the suspect as a light skinned black male in his forties, approximately six feet tall, wearing a dark baseball cap, dark sunglasses, blue surgical mask, blue latex gloves, and a black parker style jacket.

7. Investigators also interviewed the Vice President (VP) of the bank. The VP stated that she was in the break room during the robbery and did not see the suspect. She was extremely concerned about how and why the suspect received such a large amount of cash. She informed investigators that the bank had received a large amount of US currency from the bank's money carrier on Friday, September 20, 2024. This cash was supposed to be locked in the bottom right vault under dual control (requiring two employees to access). She was very concerned that JENEL had stored approximately $200,000 US currency in the top right section of the vault, which allowed him to access all of that cash himself. She further stated JENEL's employment had been previously terminated sometime in May 2023 for violation of company policy. JENEL was rehired in August 2024 as a bank teller, with control of the vault. The VP described his behavior as erratic and sometimes confrontational.

8.      Subsequent to the robbery, investigators reviewed surveillance from inside the bank. At approximately 12:51 PM investigators observed a black male wearing dark clothing, blue surgical mask, New England Patriots hat, dark sunglasses, blue latex gloves, and using one silver crutch, enter the bank through the main vestibule. The suspect then approached the victim teller station and wrote a demand note which was passed to JENEL. JENEL then entered the room containing the vault and placed US currency from the vault into a bag he, JENEL, retrieved from the vault room. Simultaneously, the bank robbery suspect removed what appears to be a bag from his pants pocket while waiting for JENEL to return. JENEL then provided the suspect with the US currency.

9.      While reviewing the surveillance with the CFO, the CFO also explained that he is in charge of training the tellers on bank robbery procedures. In the CFO's view, JENEL's actions during the robbery were inconsistent with JENEL's training. The CFO informed investigators that tellers are trained to provide only the amount of money being demanded and not to provide more. Based upon a review of surveillance video, it does not appear that JENEL looked in his cash drawer, but rather immediately proceeded to the vault, which the CFO believed to be suspicious.

10.     Based on my training and experience investigating bank robberies, I also believe that JENEL's actions during this "robbery" were unusual and not the typical reactions of a victim teller. Specifically, JENEL immediately went to the vault without being instructed to do so, rather than merely providing cash available in the drawer at his teller window, JENEL provided the robber with a bag from the bank in order to allow more money to be easily carried by the robber, and JENEL chose to provide the suspect with an unusually high amount of US currency ($197,146.00).

11. Contrary to what happened here, in my training and experience, victim tellers typically provide robbers money directly from their teller drawers (rather than the vault), provide robbers with far less money than was provided here, and do not seek to assist robbers by providing them with items such as bags. It is unusual for any teller to undertake any one of these actions. It is highly unusual, and suspicious, when a teller engages in all of these behaviors together.

12. Following the robbery, investigators followed JENEL home to Brockton after he departed the bank for the day. JENEL arrived home at approximately 6:40PM.

13. At approximately 7:58 PM, investigators observed JENEL and a second male (later identified as JUSTIN) exit the home and walk to a side yard adjacent to the driveway. This area was not fenced in, was in view of the public, and could be accessed by the sidewalk. There, they lit a fire on a grill. Investigators observed what appeared to be clothing inside the grill and the clothing began burning. Brockton Police Department was notified and arrived on scene. Brockton Police approached and inquired about the fire. JUSTIN and JENEL initially stated they were burning cardboard. One officer, however, observed black clothing being burned.

14. When this information was conveyed to investigators, the fire was extinguished, and investigators secured the residence to prevent the further destruction of evidence. JUSTIN and JENEL's phones were seized.

15. On Wednesday, September 25, 2024, at approximately 1:50 AM, members of the MSP Special Investigations Unit/FBI Violent Crimes Task Force executed a state search warrant at the Brockton residence of JENEL and JUSTIN.

16. During the search, investigators recovered $160,275.00 US Currency disbursed across two bedrooms. The currency discovered in JUSTIN's bedroom was located inside a duffle bag. This money included ten "bait bills" (in denominations of $100 each, and which matched the

serial numbers recorded by Energy Credit Union of ten $100 bills that had been stored in its vault prior to the robbery). Miscellaneous documents, blue surgical gloves, bank security plans and a crutch were discovered throughout the residence

17. At that time, JENEL and JUSTIN were arrested.

### JUSTIN's Location on the Date of the Robbery

18. Investigators have also spoken with individuals with whom JUSTIN works at Verizon. JUSTIN's manager stated that JUSTIN had requested leave on Tuesday, September 24, 2024 (the date of the robbery) for a "doctor's appointment." Investigators have also been provided with still images from Verizon surveillance depicting JUSTIN leaving Verizon at approximately 10:53 AM.

19. On September 25, investigators also spoke with another Verizon employee, Employee #2, who had been driving JUSTIN to work. On the morning of Tuesday, September 24, 2024, JUSTIN was observed to be using a crutch. JUSTIN mentioned to Employee #2 that JUSTIN needed the crutch because his ankle had been bothering him and that JUSTIN would be taking a half-day for a medical appointment.

20. Video surveillance from W.B. Mason, located near the Verizon yard where Justin works, depicts JUSTIN entering a vehicle owned by Witness #1 after leaving Verizon prior to the robbery.

21. In a subsequent interview, Witness #1 stated that on the morning of September 24 around 11:00 a.m., she picked up her boyfriend, JUSTIN, to drive him to a doctor's appointment. Witness # 1 drove JUSTIN to the area of Constance Road[2] in West Roxbury around 12:30 p.m. JUSTIN exited her vehicle with a crutch and walked away on foot. Witness #1 stated she waited

---

[2] Constance Road is less than a block from the Energy Credit Union.

24-7560-JCB

in her vehicle for JUSTIN. JUSTIN returned a short time later with a bag. Witness #1 does not know what was in the bag. They then drove to JUSTIN's house in Brockton. Witness #1 denied having any knowledge of JUSTIN committing a robbery.

22. Historical cell site information reveals that on September 24, 2024 at 12:49 PM, JUSTIN's phone was located approximately 0.25 miles from Energy Credit Union. That cell phone's location records are consistent with the phone travelling away from the area of the bank between 12:57 PM and 1:03 PM, and eventually returning to the area of JUSTIN and JENEL's residence in Brockton, MA at approximately 1:26 PM.

## CONCLUSION

23. Based on the information described above, I submit there is probable cause to believe that JUSTIN and JENEL have committed larceny from a credit union, in violation of 18 U.S.C. § 2113(b); and conspired to do so, in violation of 18 U.S.C. § 371.

Sworn to under the pains and penalties of perjury,

_____
Michael B. Traister
Task Force Officer, FBI

Sworn to before me by telephone in accordance with Fed. Rule Crim. P. 4.1 on December  6, 2024.

_____
HON. JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

